# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DOUGLAS R. SCHNEIDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 06108 |
| | ) | |
| GALLAGHER BASSETT SERVICES, | ) | Judge John J. Tharp, Jr. |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Douglas Schneider brings suit against his former employer Gallagher Basset Services, Inc. ("Gallagher") alleging age discrimination, breach of stock option agreements, and breach of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS § 115/1 *et. seq*. Gallagher moves for summary judgment. For the following reasons, the motion is granted.

## BACKGROUND[1]

Schneider was born on June 4, 1955 and was 57 years old at the time of the relevant events. GSOF ¶ 1. Plaintiff began his employment with Gallagher in March 1991 as a Manager of Client Financial Services in Gallagher's finance department, managed a team of between 8-14 employees, and was responsible for banking activities relating to payments made to claimants by adjustors. GSOF ¶ 3. At the time of Schneider's hiring, he received a copy of Arthur J. Gallagher & Co.'s ("AJG") Code of Business Conduct and Ethics that states, in relevant part:

---

[1] The following facts are taken from Gallagher's Local Rule 56.1 Statement of Facts ("GSOF") (Dkt. 70) where undisputed, Schneider's Response to Gallagher's Statement of Facts ("S Resp.") (Dkt. 74), Schneider's Statement of Additional Facts ("SSOF") (Dkt. 74) where undisputed, and Gallagher's Response to Schneider's Statement of Additional Facts ("G Resp.") (Dkt. 76).

> [I]t is the responsibility of each of us to help the company provide a work atmosphere free of harassing, abusive, disrespectful, disorderly, disruptive or other nonprofessional conduct. . . . Employees, officers or directors who fail to comply with the standards of behavior that we have described in this booklet are subject to disciplinary action that may include termination of service . . . Discipline may also be imposed for conduct that is considered unethical or improper even if the conduct is not specifically covered by our Code of Business Conduct and Ethics.

GSOF ¶ 4.

Schneider received stock options in 2003, 2004, 2005, and 2008, pursuant to AJG's 1988 Nonqualified Stock Option Plan (the "Plan") that contained the following restriction on the exercise and transfer of stock options:

> During the lifetime of the grantee, any options granted to him may only be exercised by him. All unexercised options held by a grantee shall survive the termination of the grantee's employment due to death, disability or retirement and shall immediately become exercisable upon such death, disability or retirement. Termination of grantee's employment other than by reason of death, disability or retirement shall cause all unexercised options held by such grantee to terminate.

GSOF ¶ 33. Gallagher provided employees a memorandum along with the Plan that advised them that "stock options granted to you will terminate at the time you leave the employ of [AJG]." GSOF ¶ 34. In 2008, Gallagher provided employees an Executive Plan Termination Matrix, which explained that the stock options would expire immediately upon separation from AJG due to "Layoff/Lack of Work/Reduction-In-Force," "Voluntary Resignation," and "Termination for Cause." GSOF ¶ 35. Schneider's stock options had a ten-year life span and vested at a rate of one-tenth each year, and he could exercise any of these options at the identified price per share any time after they vested, before the expiration date. GSOF ¶ 36.

In February 2011, Fidelity took over as the administrative service provider for AJG's Plans. GSOF ¶ 37. Fidelity issued a notice of change in AJG's practices relating to the exercise of stock options post-termination:

> [E]ffective March 1, 2011, we are changing our past practice and, in most cases, will now allow for a 30-day window to exercise any vested stock options and stock appreciation rights post-termination unless terminated for cause.

GSOF ¶ 38. Prior to March 2011, if a Gallagher Bassett employee wanted to exercise stock options, he or she had to contact AJG's Legal Department, which would either direct the trade or send the request to a broker for processing, but beginning in March 2011, employees could view their account information and awards, manage preferences, and exercise stock options online. GSOF ¶ 39.

From approximately 2007 until February 2012, Schneider reported to Gallagher's Chief Financial Officer, Forest Norris. Although Schneider regularly received strong performance marks in most categories on his annual performance reviews, his reviews in the Customer Excellence category were marked "needs improvement" and included comments encouraging him to improve his interpersonal communication. GSOF ¶¶ 7-12. For example, Norris's September 2007 review noted, "I agree that you have made tremendous strides over the last year to be easier for the internal departments to work with. Please continue to improve in this area. Maintaining positive attitude within the department—especially as it relates to our outsource initiative." GSOF ¶ 8. This review also stated, "Pls consider our internal depts as customers as well—I have seen improvement in 2008 in this area, please continue." GSOF ¶ 9.

Similarly, Schneider's September 2008/2009 review noted, "Doug—I gave you a needs improvement [in Customer Excellence] because I feel as though you can improve your relationship and communication skills with others within the organization. We have discussed

this on several occasions. Although it has been fewer times than before, I still feel you aren't there yet." GSOF ¶ 10. In the same review, Norris rated Schneider as "needs improvement" in the Inclusiveness and Teamwork category, noting "Same as Customer excellence above. I don't feel that you are always treating members of the Gallagher Team outside of your department with the level of respect you should." GSOF ¶ 11. In the "Development Needs" section of the same review, Schneider commented on his own performance, acknowledging the need to "work to develop a communication style that is less harsh and more tolerant, with respect to written/email and verbal." GSOF ¶ 12. Schneider admitted that he had interpersonal issues with all of his managers; each manager at Gallagher up until and including Norris had given Schneider verbal warnings regarding the tenor and tone of his emails, and Schneider acknowledged that his communication style and delivery was an ongoing issue his supervisors raised. *See* GSOF, Ex. 1 at 167:19–169:8, 184:16-19.

In late February 2012, Laura Greifenkamp became the new CFO of Gallagher, replacing Norris as Schneider's direct supervisor. GSOF ¶¶ 13-15. At the meeting introducing Greifenkamp to all of the Gallagher employees, Schneider indicated that his direct reports could ask questions regarding wage increases.[2] S Resp. ¶ 16. Over the next few months, Schneider sent a number of emails which Greifenkamp felt were inappropriate, but she "set aside" those emails because they were "not crossing the line." GSOF Ex. 4 at 39:18-22.

On October 22, 2012, however, Eric Wagner, a temporary outside consultant in Schneider's department, brought to Greifenkamp's attention an email that Schneider had sent to

---

[2] Greifenkamp asserts that Schneider prompted his direct reports to ask unrelated questions by encouraging them—*i.e.* by stating, "Barb, do you have a question?" GSOF Ex. 4 at 18:2-12. Schneider states that he did nothing but shrug his shoulders, "indicating to go ahead and ask you (sic) questions regarding increases because they had been asking him questions for months about this." S Resp. ¶ 16.

his direct reports and to Wagner referencing upper management—specifically, Scott Hudson, the President of Gallagher, and Pat Gallagher, the Chief Executive Officer of AJG—which stated:

> In contrast,[3] our day goes like this:
> Spouse A: Hi Spouse B, how was your day?
> Spouse B: It sucked!
> Spouse A: What was sucky about your day?
> Spouse B: (banging head against the wall) My day was sucky only/all because of Pat Gallagher and Scott Hudson.
> Spouse A: That's too bad.
> Spouse B: He makes work suck and makes me want to quit!
> LOL

GSOF ¶¶ 17, 20. Schneider stated that he intended the email to be "a funny, sarcastic email about how our day goes sometimes and how we have to overcome adversity," but he admitted that it could have been interpreted as derogatory and disrespectful and that it was inartful. GSOF ¶ 20; S Resp. ¶ 20.

After being notified of this email, Greifenkamp reported the incident to Christopher Neigel, Vice President of Human Resources. GSOF ¶ 21. She explained that Schneider had sent other inappropriate emails that she believed were "inappropriate but not crossing the line," but that the tone of this email "was very disparaging [and] disrespectful," "questioning upper management's authority," and was the "straw that broke the camel's back." GSOF ¶ 21; GSOF Ex. 1 at 38:16–39:23. Neigel instructed Greifenkamp to investigate further and to provide him with copies of the other emails. GSOF ¶ 22. As part of their investigation, Greifenkamp and Neigel reviewed the following emails:

---

[3] In his email, Schneider was forwarding an email his wife, a teacher, had sent to him that related a dialog that had been emailed to her by the parent of one of her students; during the parent-student dialog, the student had evidently praised Schneider's wife in some fashion [the entire dialog is not in the record], prompting Schneider's wife to forward the email to Schneider noting: "One of the reasons I am so lucky to be a teacher." Schneider then forwarded his sarcastic, fictional, dialog between a Gallagher employee and his spouse with the preamble, "In contrast, our day goes like this . . ." SSOF Ex. 1 at 218:24–220:21.

- On July 18, 2012, Christopher Curl, an account manager at Gallagher voiced concerns about Schneider's emails to clients: "[The Hartford] brought some of Doug's email responses . . . to my attention . . . they are concerned by what they see as a lack of professionalism in responding to a customer (and they are a customer)." Mr. Curl also noted, "when Doug met with Chartis a couple of weeks ago, he was great; he knew the material and was engaging. Maybe it's just the email approach."

- On April 14, 2012, Schneider responded to an emailed progress report from senior accounting Manager Mike Kulack, "That's very nice. What about the old GAB losses? Thx."

- On April 26, 2012, Schneider responded to an email inquiring whether he would participate in a conference call, "Unfortunately I will."

- On June 27, 2012, Schneider responded to emails between himself, Gallagher's Workers' Compensation Claim Representative, and an account manager at The Hartford (a customer) with, "I seem to recall something like that but that is a seriously cumbersome process," and, when informed that there was a procedure already in place to process a claim, he responded, "Enlighten me." GSOF Ex. 1 at dep. Ex. 35.

- On July 13, 2012, Plaintiff responded to an inquiry from Laurie Gregorio, Gallagher's Executive Vice President of Account Management, regarding Gallagher's prefund protocol, to which she replied "Doug: I really take offense to your response. You know darn well that you and Account Management have gone round and round about CPS following prefund requirements . . . I find it very convenient for you to now site [sic] some agreement that we may have made in 2008 when I ask for confirmation of the protocol."

- On October 2, 2012, Schneider forwarded his direct reports an email that Greifenkamp had sent to the managers regarding potentially hiring an outside person for an account management position. Schneider wrote in his email to his direct reports, "Here's a thought…HIRE FROM WITHIN!! !!"

- On October 11, 2012, Schneider forwarded his direct reports an email that Greifenkamp had sent to the managers regarding a client retention luncheon. Schneider wrote in his email to his direct reports, "How about identifying employees that are at risk of leaving...what a concept...LOL."

- On October 12, 2012, Schneider emailed his direct reports the link to an article entitled, "Warning Signs that Your Employees Are About to Leave" and entitled the email, "Interesting…"

- On October 29, 2012, Schneider forwarded his direct reports an email sent by Arui Senapathi, Director of Global Oracle HRIS in Corporate Human Resources, highlighting Senapathi's grammatical errors and stating, "I couldn't have written a more poorly worded email if I tried...We ARE doomed."

- Later that day, Schneider forwarded his direct reports an email that Greifenkamp had sent to the managers stating, "This is almost as badly written as the other email from Annupi…LOL."

- On October 30, 2012, Schneider forwarded his direct reports an email Greifenkamp sent to the managers asking for feedback. Schneider wrote, "Is there any value to being honest about what we think??"

GSOF ¶¶ 24-25; G Resp. ¶ 12.

Schneider testified that the goal of these emails was to inflate morale and help his employees see him as someone who was on their side. GSOF ¶ 26. He acknowledged, however, that having direct reports who did not follow instructions and were disrespectful would thwart your success as a manager and would "undermine your authority and your leadership and your effectiveness." GSOF Ex. 1 at 174:2-19. Schneider asserts that Greifenkamp never met with him to discuss the problems with his emails (Greifenkamp states that on one occasion, after the email exchange with Laurie Gregorio, she talked to Schneider about the incident, GSOF Ex. 4 at 50:16-20), but he acknowledges that there is no policy requiring counseling "relating to inappropriate, unprofessional, derogatory communications" on the company email system before Gallagher can terminate an employee. GSOF Ex. 1 at 275:17–276:6.

After reviewing the emails, Greifenkamp and Neigel consulted with Gallagher's legal department and decided to terminate Schneider. GSOF ¶ 29. On October 30, 2012, Greifenkamp and Neigel called Schneider into a meeting and provided him with a termination memo and copies of the emails identified in the memo. GSOF ¶ 30. They explained that Schneider was being terminated for cause, "based on the determination that [his] level of leadership is inconsistent with GB expectations." GSOF ¶ 30. The memo did not explicitly state that Schneider was being terminated for violating Gallagher policy or for insubordination. SSOF ¶ 15.

The code associated with Schneider's termination that HR entered into the computer system was "Insubordination." GSOF ¶¶ 46-47. After HR entered this code, AJG sent the information to Fidelity as part of a nightly data process, which immediately terminated Schneider's stock options. GSOF ¶¶ 41-42; S Resp. ¶ 42. Kevin Godbold, AJG's Compensation Manager responsible for overseeing the Fidelity services provided to AJG employees, testified that no employee terminated for cause has been allowed to exercise vested stock options post-termination since Fidelity began managing AJG's equity programs in March 2011. GSOF ¶ 45. Schneider presents the affidavits of two employees, Robert Mason and Dan DeFillipo, who were terminated as part of a reduction-in-force ("RIF") (not for cause).[4] G Resp. ¶ 19; Reply at 6, Dkt. 75. Mason and DeFillipo were both over the age of 55 when terminated and both were permitted to exercise their options post-termination. Reply at 6.

Schneider brought suit against Gallagher, alleging that the company had a discriminatory animus against people based on their age, and that he was terminated because of his age. GSOF ¶ 49. Schneider identified three pieces of evidence supporting his age discrimination claim: (1) a list of employees terminated between September 2009 and March 2013 as part of a RIF; (2) conversations Schneider had with other Gallagher employees; and (3) discriminatory statements Scott Hudson, Gallagher's President, made at company meetings. GSOF ¶ 52.

Gallagher produced a list of employees terminated between September 2009 and March 2013. SSOF ¶ 4. Of the 58 employees on the list, nine are under the age of 40; 85% of the employees terminated were over the age of 40. SSOF ¶ 4. As part of the 2009 RIF, Schneider was responsible for reducing his head count by five employees; he terminated five individuals,

---

[4] Schneider failed to identify Mason and DeFillipo during discovery, as required by Federal Rule of Civil Procedure 26(a). Gallagher requests that these affidavits be stricken pursuant to Federal Rule of Civil Procedure 37(c).

four of whom were over 40, but testified that age was not a factor in his decisions about who to terminate. GSOF ¶ 59.

Schneider identified three conversations with current or former Gallagher employees—Bill McCarthy, Sue Thompkins, and Nancy Mortell—regarding the termination of older employees. GSOF ¶ 61. McCarthy, former VP of claims management, expressed that he was upset that he was let go after 30-plus years with the company. GSOF Ex. 1 at 13:12-16; 30:1-15. Thompkins, a former corporate controller for AJG, was terminated as part of a RIF in early 2010. GSOF Ex. 1 at 14:19–15:17. Mortell told Schneider about a number of individuals (six to ten people) terminated as part of a RIF in early 2012; Schneider could not recall the names of most of the individuals, and Mortell did not tell Schneider the ages of any of the employees. GSOF ¶ 63; GSOF Ex. 1 at 39:9–40:14.

In March or April 2012, Scott Hudson attended a finance division meeting with 30-40 finance employees and made a statement about 30-somethings being the future of the company. GSOF ¶¶ 65-67. Although Schneider could not recall Hudson's exact words, he testified that he "believe[d Hudson] did say 30-somethings." GSOF Ex. 1 at 100:6-21; S Resp. ¶ 67. Schneider stated that, after the meeting, two of his direct reports complained about Hudson's comments and voiced concerns about their long-term employment due to their age. GSOF ¶ 68. Although Gallagher policy required Schneider to report these complaints, he did not do so because he did not think the complaints were "relevant at the time" and because it was a very busy time for the company. GSOF ¶ 69; S Resp. ¶ 69. Nor did Schneider voice his own concerns about Hudson's comments because, he claims, he feared retaliation. GSOF ¶ 70. Schneider had previously complained about outsourcing to India and merit increases. GSOF ¶ 70.

Schneider filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") in March 2013.[5] GSOF Ex. 1 at 281:5-18. Schneider filed suit against Gallagher in August 2013, alleging unlawful age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*. Dkt. 2. He amended his Complaint in March 2014 to include claims for breach of stock option agreements and breach of the IWPCA. Dkt. 33. Gallagher filed a motion to dismiss the two additional claims, which this Court denied. Dkts. 42, 58. Gallagher now moves for summary judgment. Mem. in Supp. Dkt. 71.

## DISCUSSION

Schneider's claims are based on his termination from Gallagher in 2012 and the immediate extinguishment of his stock options. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding Gallagher's motion for summary judgment, the Court construes all facts and inferences in favor of the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). If the moving party has demonstrated the absence of a disputed material fact, then the burden shifts to the nonmoving party to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). Based on the undisputed facts in the record, Schneider has not met his burden to provide evidence of specific facts creating a genuine dispute as to Gallagher's liability for his termination or for the extinguishment of his stock options. Summary judgment is therefore granted to Gallagher.

---

[5] Gallagher's Answer to Schneider's original Complaint pled affirmative defenses relating to Schneider's EEOC charge. *See* Dkt. 10 at 6-7. Gallagher has not raised any issues relating to Schneider's EEOC charge in response to the filing of the Amended Complaint.

# I.    ADEA Claim

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "To establish a disparate-treatment claim under the plain language of the ADEA, [ ] a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). It is therefore Schneider's burden at the summary judgment stage to "show evidence that could support a jury verdict that age was a but-for cause of the employment action." *Fleishman v. Continental Case Co.,* 698 F.3d 603, 604 (7th Cir. 2012). Schneider may attempt to satisfy this burden through either the "direct" or "indirect" method of proof. *Mullin v. Temco Machinery, Inc.,* 732 F.3d 777, 776 (7th Cir. 2013).

A plaintiff using the direct method can employ both direct evidence—an employer admitting its discriminatory intent ("*e.g.* the 'smoking gun' case")—and circumstantial evidence that allows a trier of fact to infer intentional discrimination. *Id*. Circumstantial evidence can include: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Id*. (*quoting Sun v. Bd. of Trs. of Univ. of Ill.,* 473 F.3d 799, 812 (7th Cir. 2007)). To survive summary judgment under the direct method, a plaintiff "must produce enough evidence that a rational jury could conclude that the employer took the

adverse action against the plaintiff because he is a member of a protected class." *Mullin*, 732 F.3d at 777.

The indirect method of proof requires a plaintiff to show that (1) he was meeting his employer's legitimate expectations; (2) he suffered an adverse employment action; and (3) similarly situated, substantially younger employees were treated more favorably." *Fleishman*, 698 F.3d at 609 (*quoting Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 771-72 (7th Cir. 2002)). If plaintiff proves all three elements, the burden shifts to the defendant to provide a legitimate nondiscriminatory reason for the action. *Fleishman*, 698 F.3d at 609. To survive summary judgment, the plaintiff then must show that there is an issue of fact whether the reason the defendant provided is pretextual. *Id.*

Schneider does not expressly state whether he has elected the direct or indirect method of proof. *See* Resp. at 4-6. Because he argues that he was performing his job in a legitimate manner and that his termination was pretextual, the Court first assumes Schneider is proceeding under the indirect method, but his claim fails as a matter of law under either method.[6]

Starting with the indirect method, Schneider has failed to adduce evidence to create a dispute of fact as to whether he was meeting his employer's legitimate expectations or whether Gallagher treated similarly situated, younger employees more favorably. As to the former, Schneider's employment evaluations going back to 2007 indicate that he had difficulties with his interpersonal relationships with internal and external customers. Each year, his reviews reminded him to work on his communication style within the office and externally, and Schneider even acknowledged his awareness of the need to develop these skills, noting "[I need to d]evelop a

---

[6] Schneider's termination certainly qualifies as an adverse employment action under either method, but he fails to adduce sufficient evidence to establish any of the remaining elements of either method.

less caustic approach to dealing with certain internal 'cross' departmental issues" on his 2007/2008 review and noting "[a] couple communication indiscretions via email" and "[w]ork to develop a communication style that is less harsh and more tolerant, with respect to written/email and verbal" on his 2008/2009 review. SSOF Ex. A at 51, 56, 59.

Schneider states that he received good performance reviews and stock option grants and bonuses throughout the years as evidence that he was meeting Gallagher's expectations. Resp. at 6. Greifenkamp never met with him about his attitude, Schneider further asserts, which must imply that she was not unhappy with his performance. Schneider admitted that there was no requirement for performance counseling, however, before Gallagher could justifiably terminate an employee. Furthermore, Schneider acknowledged that every manager up until Greifenkamp had given him verbal warnings regarding the tenor and tone of his emails, and that his communication style and delivery was an ongoing issue throughout his employment at Gallagher.

AJG's Code of Ethics explicitly stated that "[e]mployees . . . who fail to comply with [a work atmosphere free of harassing, abusive, disrespectful, disorderly, disruptive or other nonprofessional conduct] are subject to disciplinary action that may include termination." GSOF ¶ 4. Schneider admitted that, although he intended his emails to be funny, they could have been interpreted as derogatory and disrespectful. Even taking the evidence in a light most favorable to Schneider and assuming that Greifenkamp did not meet with him or discuss Schneider's interpersonal issues with him before terminating him does not create an issue of fact as to whether he was meeting his employers legitimate expectations. That Schneider met some, even many, of Gallagher's expectations is not the point; an employer needn't prove that an employee was an abject failure to avoid an implication that the employee was terminated for impermissible

reasons. Gallagher expected its employees—and particularly its managers—to conduct themselves in a manner that was respectful and professional toward clients and coworkers; mocking and disparaging the CEO and President and other senior personnel in emails to subordinates does not, under any conceivable standard, comport with that expectation. Schneider does not dispute—how could he?—that he sent emails that could reasonably be understood to be disrespectful and unprofessional. Schneider was, then, failing to meet Gallagher's legitimate expectations.

Schneider also failed to present evidence that Gallagher treated any younger but otherwise similarly situated employees differently. He identified no Gallagher employees younger than Schneider who sent inappropriate, unprofessional emails to internal staff or external clients yet remained employed at Gallagher as required to satisfy the third element of the indirect method of proof. Nor did he identify any younger, similarly-situated employees who engaged in any form of misconduct at all who were treated more leniently than was he. Schneider points to a list of employees terminated as part of a RIF between 2009 and 2013 as circumstantial evidence of that Gallagher preferred younger workers over older; the list includes 58 employees, only nine of whom are under forty. But that statistic is meaningless without context of the percentage of total employees at Gallagher that are over and under the age of forty. If 85% of the workforce was over 40, then the fact that 85% of the terminated employees were over 40 is irrelevant. As the Seventh Circuit has explained, "Our court generally has not found that statistical evidence concerning terminated employees, without more, is relevant to our analysis of whether the articulated reasons for discharging this plaintiff were pretextual or discriminatory." *Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 400 (7th Cir. 1998). Any weight given to this statistic is even further diminished by the fact that Schneider, himself,

was responsible for terminating four of the individuals over forty on the list, and he testified that age was not a consideration in his decision.

Schneider's claim fares no better under the direct method. The only additional evidence Schneider relies on to support an inference that he was fired because of his age—the conversations Schneider recounted with McCarthy, Thompkins, and Mortell, and Hudson's statement at the finance meeting—are not evidence of intentional discrimination. At most, the conversations demonstrate that Schneider kept in touch with former employees and that they updated him on terminations at Gallagher. None of those conversations lead to the inference that Gallagher had an intent to terminate older individuals. McCarthy was unhappy about his termination, and Thompkins was subject to a RIF in 2010, but so far as the record reflects, neither said anything to suggest that their terminations were based on their ages. Mortell told Schneider about a number of people who had been included in the 2012 RIF, but Schneider could identify neither the individuals nor their ages.

Nor does Hudson's statement support a finding that Gallagher fired Schneider because of his age. To say that "30-somethings" are the future of the company cannot reasonably be construed as encouragement to discharge those 40 and above; to the contrary, it says that the time for the 30-somethings is not yet at hand. This is particularly so in the absence of any other evidence to suggest that Hudson was promoting an agenda to discriminate against the company's older workers. Hudson's remark—even if made—was the sort of stray remark that has repeatedly been found inadequate to support an inference of discriminatory animus. *See, e.g.*, *Fleishman*, 698 F.3d at 605 ("[I]solated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process.'"); *see also Markel v. Bd. of Regents of Univ. of Wis. Sys.,* 276 F.3d 906, 910-11 (7th

Cir. 2002) (comments two months before termination were not contemporaneous and therefore not indicative of discrimination). Moreover, Hudson was not involved in the decision to terminate Schneider; Greifenkamp conferred with Neigel to make the initial decision and only Greifenkamp and Neigel were present with Schneider in the ultimate termination meeting. Schneider admits as much: "Ms. Greifenkamp and Mr. Neigel . . . were the deciding factor in terminating Mr. Schneider." Resp. at 8. Because Hudson was not involved with the decision to terminate Schneider, his stray comment about 30-somethings does not lead to an inference of discrimination. *See Tate v. Ancell*, 551 F. App'x 877, 888 (7th Cir.) *cert. denied sub nom. Fedder v. Addus Healthcare, Inc.*, 135 S. Ct. 83 (2014) (noting that courts "routinely discount" the "'stray remarks' of non-decisionmakers . . . as proof of an employer's alleged animus"); *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001) ("Stray remarks made by non-decisionmakers are not evidence that the decision had a discriminatory motive.").

Finally, the Court notes that there is no evidence of pretext here.[7] To establish that Gallagher's proffered reason was mere pretext, Schneider needed to "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [Gallagher] did not act for the asserted non-discriminatory reasons." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007). It is not for this Court to determine whether or not Gallagher may have been hasty or otherwise unwise in its termination of Schneider: "it is not the court's concern that an employer may be

_____

[7] The evidence used to show pretext in the indirect method may also be used under the direct method. *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 808 (7th Cir. 2014). *See, e.g., Mullin*, 732 F.3d at 776 (noting that "evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination" is a type of circumstantial evidence under the direct method); *Fleishman*, 698 F.3d at 609 (noting that, to survive summary judgment under the indirect method, the plaintiff must rebut a defendant's legitimate, nondiscriminatory reason by showing that there is an issue of fact whether the reason the defendant provided is pretextual).

wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008). Schneider has offered no evidence that the stated reason for his termination, that his "level of leadership is inconsistent with GB expectations," was not honest. GSOF ¶ 30. The uncontroverted evidence demonstrates a documented history of Schneider's problems with his communication style, and his termination memo attached the emails upon which the decision was based.

There is nothing in the record to support a finding that Gallagher's stated reasons for suspending and terminating Schneider were inconsistent or mere fabrications. Absent such evidence, Schneider has failed to rebut Gallagher's legitimate non-discriminatory reason for his termination. Summary judgment is, therefore, granted to Gallagher on the ADEA claim.

## II.     Breach of Stock Option Agreement

Schneider states that his stock options were an earned benefit, part of his compensation for a job well done. Resp. at 9. He asserts that, by extinguishing his unexercised, vested stock options at the time of his termination, that Gallagher abused its discretion under the Plan (by terminating Schneider without notice), thereby breaching the implied covenant of good faith and fair dealing. As Gallagher rightly points out, although terminating Schneider was a discretionary act, extinguishing his stock options was not; Gallagher followed its standard procedure by entering a code associated with the termination into Fidelity's system and automatically transferring that code to Fidelity, which then updated Schneider's account accordingly. Here, the code entered was associated with termination for cause, which resulted in the automatic extinguishment of his unexercised stock options.

Schneider argues that Greifenkamp never stated that he was being terminated for insubordination but "later deemed such termination as insubordination when coding it to remove his stock options."[8] Resp. at 11. Whether the code entered was "Insubordination" or any of the other codes used for termination for cause is irrelevant, however, because they all have the same effect of automatically extinguishing the stock options. GSOF ¶¶ 44, 47; GSOF Ex. 4 at 61:4-14, 78:1-15. The termination memo clearly states that Schneider was terminated for cause, and the contractual language of the Plan expressly states, "Termination of grantee's employment other than by reason of death, disability or retirement shall cause all unexercised options held by such grantee to terminate." GSOF ¶ 33. Fidelity also issued an announcement amending the post-termination treatment of stock options that further clarified that terminations for cause extinguished unexercised options: "[we] will now allow for a 30-day window to exercise any vested stock options and stock appreciation rights post-termination **unless terminated for cause**." GSOF ¶ 38 (emphasis added). Gallagher did not breach the covenant of good faith and fair dealing but rather followed its standard procedures.

Schneider attempts to avoid the contractual language automatically extinguishing stock options for terminations for cause by arguing that Gallagher waived its right to strict compliance with the Plan; he relies on the affidavits of Mason and DeFillipo as evidence that Gallagher permitted certain employees to retain their stock options post-termination despite the language of the Plan. By failing to identify Mason and DeFillipo in discovery, as required per Federal Rule of Civil Procedure 26(a), however, Schneider waived the right to rely on their affidavits in

---

[8] There were only four codes associated with termination for cause: (1) Misrepresentation—Application or Credentials; (2) Ethical-Legal Misconduct/Non-compliance; (3) Insubordination; or (4) Misuse of Company Assets. GSOF Ex. 3 at 80:10-23, dep. Ex. 11. Insubordination is the only code under which Schneider's reason for termination, "level of leadership is inconsistent with GB expectations," fits.

opposition to summary judgment. *See* Fed. R. Civ. P. 37(c). Even if the Court considered the affidavits, Mason and DeFillipo were terminated as part of a RIF, and not for cause, so their treatment under the Plan is not analogous to Schneider's.[9]

Schneider also argues that Fidelity's amendment allowing a 30-day grace period post-termination (except for termination for cause) waived Gallagher's right to strict compliance with the Plan. The Plan, however, grants Gallagher the right to "amend, suspend or terminate the [Plan] provided that no such termination or amendment may . . . adversely affect the rights of such individual under such option." Reply at 7; SSOF Ex. B at 28. Here, the amendment did not adversely affect the Plan participants' rights but rather granted additional benefits to all terminated employees except those terminated for cause. This is no way indicates waiver of the right to enforce the contractual language of the Plan.[10] *See R & B Kapital Dev., LLC v. N. Shore Cmty. Bank & Trust Co.*, 832 N.E.2d 246, 255 (Ill. App. Ct. 2005) ("The party claiming the implied waiver has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights."); *Tatom v. Ameritech Corp.*, 305 F.3d 737, 746 (7th Cir. 2002) (denying a violation of the covenant of good faith and fair dealing where "the record gives no indication that [defendant] acted precipitously or arbitrarily in deciding to forfeit [plaintiff's] stock options").

---

[9] Because Mason and DeFillipo were not timely disclosed as witnesses, they were not deposed. Gallagher therefore asserts that it should be permitted to rely on information outside the record in responding to Schneider's argument based on their affidavits. The Court agrees. Gallagher's Reply brief reports that both Mason and DeFillipo were over 55 when terminated. As such, they were treated as retired under the Plan and were eligible to receive retirement benefits—unlike Schneider. *See* Reply at 5-6.

[10] Schneider makes an argument about the definition of "for cause" under section 5(a) of the Plan. Resp. at 11-12. This section, however, is only applicable to employees who compete with Gallagher after leaving employment; it does not define the conduct permitting termination "for cause." *See* Reply at 3.

Schneider has failed to establish a genuine dispute of material fact regarding the stock option agreement; Gallagher followed procedure and acted in accordance with the contractual language. Thus, summary judgment is granted to Gallagher on this claim.

## III.     Breach of IWPCA

The IWPCA requires that "[e]very employer [ ] pay the final compensation of separated employees in full, at the time of separation." 820 ILCS 115/5 (1984). The Act defines "final compensation" as "as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (2015). "The Wage Act 'does not confer any rights to recovery of final compensation in the absence of a contractual right.'" *Baxi v. Ennis Knupp & Associates, Inc.*, No. 10-CV-6346, 2011 WL 3898034, at *14 (N.D. Ill. Sept. 2, 2011) (*quoting Byker v. Sequent Computer Sys., Inc.,* 1997 WL 639045, at *7 (N.D. Ill. Oct. 1, 1997)).

As explained *supra*, Gallagher did not have a contractual obligation to provide Schneider with time to exercise his stock options post-termination. Because Schneider has not provided evidence that Gallagher failed to pay his "final compensation," Gallagher is granted summary judgment on the IWPCA claim.

\*     \*     \*

Even construing all facts and inferences in favor of Schneider as the non-moving party, he has failed to demonstrate a genuine dispute of material fact for trial on the ADEA claim, the breach of stock option agreement claim, and the IWPCA claim. Therefore, Gallagher's motion for summary judgment is granted on all counts.


Dated: September 30, 2015

John J. Tharp, Jr.
United States District Judge